*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 19, 2020

Plaintiff-Appellee,

v

No. 348247
Macomb Circuit Court
LC No. 2017-004684-FC

ANDREW MICHAEL FIACCO,

Defendant-Appellant.

Before: GLEICHER, P.J., and K. F. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant Andrew Fiacco shot and killed his friend, Stephen McAfee, and covered up the crime by dismembering and burying McAfee's body. A jury convicted Fiacco of second-degree murder, MCL 750.317 (in lieu of the greater offense of first-degree premeditated murder); possession of a firearm during the commission of a felony, MCL 750.227b(1); disinterment, mutilation, defacement, or carrying away of a human body, MCL 750.160; and lying to a peace officer, MCL 750.479c(2)(d).

Fiacco contends that the circuit court should have suppressed his April 27, 2017 custodial statement because during the interrogation, the police ignored his request for the presence of counsel. We agree that Fiacco unequivocally invoked his right to an attorney, and that the police violated his Sixth Amendment right by continuing to question him in the face of its invocation. But even absent the introduction of Fiacco's full statement, the evidence overwhelmingly supports his guilt. His additional claims of error have no merit. We affirm.

## I. BACKGROUND

Fiacco and McAfee had been friends since kindergarten. They were 19 years old at the time of the homicide and lived in the same neighborhood with their respective parents. In the early morning hours of March 10, 2016, Fiacco shot and killed McAfee in a wooded area near their homes. About a month later, Fiacco revisited the scene with his 17-year-old girlfriend, Eevette MacDonald, to show her the body. A month later, Fiacco and MacDonald returned and cut up McAfee's body with an axe. They left some of McAfee's remains in the woods and stuffed other body parts in a duffel bag they intended to bury in Fiacco's parents' backyard.

-1-

After searching for their son, including by contacting Fiacco, McAfee's parents reported him missing on March 13. The police suspected that Fiacco knew something about McAfee's disappearance. Early investigation revealed that McAfee's last outgoing call was to Fiacco at 3:17 a.m. on March 10. While questioning Fiacco about an unrelated offense on March 17 and September 12, 2016, police asked Fiacco if he knew McAfee's whereabouts. Fiacco indicated that he had not seen McAfee since February 29.

In April 2017, the police received specific information linking Fiacco to McAfee's disappearance. MacDonald had confessed to a friend that she knew the location of McAfee's body. The friend's family advised police, who brought MacDonald in for questioning. MacDonald led the police to McAfee's remains and provided detailed information that had been shared with her by Fiacco. At Fiacco's trial, the jury heard MacDonald detail the information she had given the police. Aside from Fiacco's improperly admitted confession, the prosecution's case rested primarily on MacDonald's testimony. Because we have concluded that an average jury would have convicted Fiacco even without the confession, we turn to a detailed discussion of the remaining evidence.

When McAfee disappeared, MacDonald was 17 years old and lived with Fiacco. Fiacco became convinced that MacDonald and McAfee were engaged in a sexual relationship, and he accused her of this "[q]uite often." On the evening that McAfee disappeared, MacDonald and Fiacco argued "about a couple of things," including McAfee. Fiacco again accused MacDonald of infidelity. When she awoke around 2:00 or 3:00 a.m., Fiacco and his car were gone. The next morning, Fiacco informed her that he had picked up McAfee, driven him to a gas station where "they hung out . . . for a couple of minutes," and dropped McAfee off before returning home. MacDonald left on a planned trip to Florida and did not learn of McAfee's disappearance until she returned a week or two later.

Back in Michigan, MacDonald inquired about McAfee several times. Fiacco eventually admitted to her that he had killed McAfee, shooting him "three times in the back" after McAfee "had seen something on [Fiacco's] phone that he wasn't supposed to, relating to the Mafia." He did not describe to MacDonald that he had acted in self-defense. Fiacco also indicated that he had kept McAfee's "vape" but threw away his cell phone. When MacDonald expressed disbelief, Fiacco responded that "he was going to show [her]."

Fiacco drove MacDonald to see the body, holding a handgun as he drove. He had never visibly carried a gun in her presence before, and MacDonald recounted that she "was terrified." Fiacco expressed that he "couldn't quite remember" where the body was located, but he eventually took MacDonald to a wooded area. Still holding a handgun, he led her into the woods, where they discovered McAfee's body. MacDonald feared that Fiacco was planning to shoot and kill her but ultimately the two left the grisly scene.

According to MacDonald, "[m]aybe a month afterwards," Fiacco again brought her to the wooded area, telling her that she had to help him dispose of McAfee's remains. He brought a duffel bag and an axe with them, along with the same handgun. After taking McAfee's watch, Fiacco told MacDonald that because "the Mafia" knew she had seen the body, she was required to actively "help" in disposing of it. MacDonald was unable to do so but observed Fiacco use the

axe to separate the body in two. Wearing gloves that Fiacco had provided, she then helped Fiacco place McAfee's body in the duffel bag. Fiacco stowed the duffel bag in MacDonald's trunk.

MacDonald testified that she also helped Fiacco bury portions of McAfee's body in Fiacco's backyard. She described that with her assistance, Fiacco poured cement over McAfee's remains and the two covered the grave with dirt. MacDonald was unaware that a portion of McAfee's body was buried in a different location.

After she and Fiacco broke up, MacDonald told a friend what had happened, and the friend's family contacted the police. MacDonald was arrested and charged as an accessory after the fact. She testified pursuant to a plea agreement under which one charge against her was dismissed, lowering her minimum sentencing guidelines by two months. The prosecution did not oppose her probationary sentence under the Holmes Youthful Trainee Act, MCL 762.16 *et seq*.

The police found parts of McAfee's body buried in Fiacco's backyard and located McAfee's watch and his "vape" in Fiacco's home. Two guns were also found in the home: an old Russian revolver and a smaller Walther PPK pistol. Cell phone evidence established that McAfee had made a "FaceTime" call to Fiacco at 3:17 a.m. on the day McAfee disappeared. An autopsy revealed that McAfee has sustained two gunshot wounds to the head, one of which was likely to have been almost instantly fatal.

Based on the information MacDonald provided, the police located Fiacco in a drug rehabilitation facility, awakened and arrested him. After two hours of questioning, Fiacco admitted that he had shot and killed McAfee. Fiacco first asserted that he accidentally shot McAfee in self-defense, but then admitted to intentionally shooting McAfee two more times in the back while McAfee lay on the ground.

At trial, the prosecution theorized that that Fiacco lured McAfee to the woods with a deliberate intent to kill him because Fiacco believed that MacDonald and McAfee were having an affair. The defense contended that Fiacco shot McAfee in self-defense. Fiacco did not testify; his counsel largely premised the self-defense claim on statements Fiacco made during his police interrogation. Additionally, a defense witness who knew both Fiacco and McAfee testified that McAfee always carried a knife and had "[flown] off the handle" several times in the presence of Fiacco and the witness. The witness also recounted occasions in which McAfee had attacked a person and used the knife to slash a trampoline and car tires.

## II. CUSTODIAL STATEMENT

### A

Detective Mark Morfino and a detective Shell interrogated Fiacco shortly after Fiacco's early-morning arrest. At the outset of the custodial interrogation, Detective Morfino read Fiacco his *Miranda*[1] rights, noting that Fiacco had "been through this a couple of times with" him. After

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

an accurate reading of his rights, Fiacco indicated that he understood his rights, but he did not verbally waive his rights or sign a written *Miranda* waiver.

After some general questions, the detectives asked Fiacco why he believed they were interrogating him. Fiacco responded, "It's something about my case?" referring to an unrelated shooting at an ATM. Detective Morfino queried, "If you had to pick something why the cops would show up at three o'clock in the morning, and roust you out of bed, what'd you think we'd want to talk to you about?" Fiacco then accurately assessed, "About Steven [McAfee]?" Detective Morfino informed Fiacco that "pretty much everything" had recently "come to light," and the police already knew "what happened," just not "why it happened."

Fiacco admitted that he had seen McAfee on the night of his disappearance, explaining, "[W]hen he Facetimed me, it was for, he liked to smoke pot." Fiacco indicated that he sold McAfee "a bag of pot" that evening, and claimed he had previously lied about the transaction because he was on probation at the time. Fiacco initially indicated that he picked McAfee up at his parents' house, sold him the bag of marijuana, and then dropped him off "[d]own the street." Detective Morfino suggested that Fiacco was being less than honest, but Fiacco insisted, "That's—that's what I remember."

Detective Morfino again questioned Fiacco's veracity, and the following exchange ensued:

*DETECTIVE MORFINO*: Okay, listen to me. Just listen to me first, okay? People make mistakes, you're a young man, okay? But, you know there comes a time where if - - you have to know that people are looking into this kind of thing, and we take it very seriously, and there has been a lot of time and resources, and people that were talked to.

And again, just to rehash we talked to you initially, we got some of your information. I talked to you a while ago, I got some more information as time progresses. . . . I'm not going to tell you everything I know. I know everything right now. Okay, and if you want to sit here and tell me you went to the house, and just left, that's not true, and . . . I don't want to leave on that note, okay? So, I'm telling you, I'm not lying to you right now. Now you have to do it, cause there's a lot of other people involved. You don't want to play musical chairs here, and be left with the only person that's not sitting down on a chair, okay? Cause that's what gonna happen right now.

*FIACCO*: Mm-hmm.

*DETECTIVE MORFINO*: Okay? Trust me, we've talked to people, okay? We're doing things right now, looking in and confirming some of this stuff, and everything, I will tell you, is adding up quite nicely, okay?

*DETECTIVE SHELL*: That's why you're here [Fiacco], cause we - - we already talked to a few people.

*DETECTIVE MORFINO*: We don't normally for probation, come get you like this, okay? We're normally not here at four in the morning, okay? This is not

a common thing, but a lot of things have taken place, okay, and you could sit there and shake your head and say you just do that, but I know that's not true. Okay?

  *FIACCO*: Well, I - -

  *DETECTIVE MORFINO*: Well listen to me, listen to me, before you talk, I don't want to leave like that. Okay? I know what happened; I don't know why it happened. Okay? I want to sit here man to man, and talk to you and have you tell it. . . . I've confirmed stuff in the report. You're - - you're pretty convincing, I'll give you that. But now, no matter what you tell me, I know that it's - - it's not true. Okay, you can sit here stone-faced and everything like that, but there's things being done, okay, and we're gonna come back and it's gonna come to light eventually, and you're going to know what we know, okay, but you need to talk to us right now.

  *DETECTIVE SHELL*: Like when it gets daylight?

  *FIACCO*: *Well then I'd rather speak when my lawyers [sic] present.*

  *DETECTIVE MORFINO*: Okay, is that something you want to do?

  *FIACCO*: *Ye - -*

  *DETECTIVE MORFINO*: . . . [W]ell, if you didn't do anything wrong, I don't understand.

  *FIACCO*: Because I feel like you guys are coming at me like I did something wrong.

  *DETECTIVE MORFINO*: I'm not coming at you. I'm - - I'm telling you, that I have some - - a bunch of information right now, and I'm trying to get your side of the story, and we've talked to more than one person, and everybody's story is matching, except for yours, okay?

  If you want to sit here and tell me you don't know, we know that's not the case, okay? But this is gonna help you right now, okay? Now is the time to be a man, and come out and tell us, okay? Cause there's more things in the works that's gonna pile and pile and pile and pile, okay? And I'll tell you right now, it's a pretty nice pile, but I'll tell you, in the near future, it's gonna be a really big pile, okay?

For several pages of transcript, the detectives hinted about the evidence they had uncovered, including that evidence was buried in his parents' backyard and could be found at the particular location in the woods. The detectives then urged Fiacco to speak now:

  *DETECTIVE MORFINO*: [Fiacco], now is the time man, now is the time. Please.

*DETECTIVE SHELL*:  So you could - - you can save a little bit of your ass you got left, if you want to talk to us.

*DETECTIVE MORFINO*:  Don't do this man.  Listen, you know it.  Listen, you know it, you know that we know things, okay?

*DETECTIVE SHELL*:  He knows we know[].

*DETECTIVE MORFINO*:  You know we know. . . .  I'm repeating myself, I'll give you the first time we talked, you just get a feel before I ever met ya.  I've talked to you a couple of times, and I know who you are, okay?

I'll tell you when we first talked to you, you were nervous, okay?  You're hard swallowing, you're doing all that stuff, I can see veins in your neck popping, okay?  You know right now that I know by your face that you know we know, okay?  Now is the time, man.  Do it.  Don't act like that hard-ass and let people see this, okay?  Make somebody see that there is a human being behind this person, and not just some monster, okay?  So this may be the only opportunity you have.  Okay?  And you don't want to regret this, and you had an opportunity to explain yourself, okay?

*DETECTIVE SHELL*:  This is the only opportunity.

*DETECTIVE MORFINO*:   . . . [A]re you going to get in trouble for something?  Yeah, that's not up to us.  Could you lessen the blow if you're honest about it and people see that, okay?

Or do you want to just, do you want to go to your grave just hanging tough and not saying . . . what happened.  And I don't think you want to do that, I can tell.  You want to talk to somebody.  This kind of shit's been eating you up for almost a year, man.  Okay?  So, again, we're talking to a lot of people, everything's pointing at you.  Okay?  I want your side of the story.

\* \* \*

*DETECTIVE MORFINO*:  . . . I want your take on what happened, [Fiacco], okay?  I know what happened.

*DETECTIVE SHELL*:  Why?

*DETECTIVE MORFINO*:  I don't know what was in your head.

*DETECTIVE SHELL*:  Did somebody tell you to do this? . . .

\* \* \*

*DETECTIVE SHELL*:  Did the guy do something to you?

*DETECTIVE MORFINO*:  I just want to hear what happened, [Fiacco].  I can tell you want to tell me, it's right there, it's been tearing you up, okay.  That's a . . . hard thing to live with for this long, looking over your shoulder, okay?

And another thing, we have some people involved here that you may or may not care about.  I want your version of what goes down, because they might get lumped in this mess as well.  Okay?  You've got family to think about.  Your parent[s] - - who do you live with at the house.  You've got your parents, you've got your brother, you've got a sister?

*FIACCO*:  Yeah.

\* \* \*

*DETECTIVE MORFINO*:  . . . You don't want to put them through . . . this wreck.  Things are doing to happen, but they can go smooth, or they can . . . take a hard turn.  Either way, we're gonna get to the same outcome, okay.  It's just how we get there.

*DETECTIVE SHELL*:  So, what - - what happened, Andrew?

*FIACCO*:  *Am I allowed to speak when my lawyer's present though?*

*DETECTIVE SHELL*:  Well you're only get one [sic] chance to talk to us, so, you know I mean, we - - we could talk to you that's - -

*FIACCO*:  *You told me that um, I could have my lawyer here.*

*DETECTIVE MORFINO:  Do you want a lawyer or do you want to talk to us right now?  I'm giving you an opportunity.  If you tell us that you want a lawyer, we're going to get up and leave, and you roll the dice.  It's absolutely your right.*

*DETECTIVE SHELL:  Then there is no - -*

*DETECTIVE MORFINO:  Okay?*

*DETECTIVE SHELL:  - - there's no more talking - -*

*DETECTIVE MORFINO:  But, again, I wanted - -and we're never gonna get your side of the story, okay?  And - -and you're just gonna have to roll the dice.*  Like I said, . . . there's a lot of stuff and it's all pointing to you.  Again, *and I know you said an attorney, and I want to make it clear, that's your right to have an attorney here while you're talking to us*, but, we're probably not gonna get that chance, so we're probably not gonna talk to you again, okay?  Now is the time for [Fiacco] to explain what happened, because we're probably not gonna get it.  *If you tell us, "You know what, I'm done with you guys, I want to see a lawyer", we're going to get up and leave.  Okay?*

-7-

*DETECTIVE SHELL*: Give him a chance to . . . tell us what happened. Tell us whatever you want, but . . . don't bullshit us. If you only want to give us a couple of details, I mean, tell us, what . . . happened that night or morning or whatever that things went so south.

*DETECTIVE MORFINO*: [Fiacco], we know. We know, [Fiacco].

*FIACCO*: I ain't - -

*DETECTIVE MORFINO*: I'm telling you man, we know, okay, and . . . it's over, okay? So you need to . . . talk to us and give us your version, okay?

Again, look . . . at what's happening here. How . . . you got pulled out of this rehab center. That don't happen, did you ever see that happen since you've been in there? Okay. It's not just a fluke that we're doing this. Okay? We work during the - - we're here at four o'clock in the morning, we have undercover guys there. It's not a little thing, we're not coming to pick you up for breaking into cars, okay? So you know - - don't put your family through this, don't put people that unnecessarily have to be involved, okay? All we're asking you to do is be a man and talk to us, okay?

*DETECTIVE SHELL*: Let him talk (unintelligible)[.]

*DETECTIVE MORFINO*: That's as simple as that and it's easy - -

*DETECTIVE SHELL*: Let him talk to him [sic].

*DETECTIVE MORFINO*: - - it's easy when you tell the truth.

*FIACCO*: *So - - so if I ask for a lawyer, we're not going to speak again?*

*DETECTIVE MORFINO: If you ask for a lawyer, we'd be done here.*

Do you think - - *do you have an attorney that can come here at four o'clock in the morning? I don't think anybody's gonna do it*, okay, so we're - - we're gonna be done. That's your call. It's not a threat, but we're going to get up and leave. *You - - you want to talk to an attorney, we're done. If you want to tell us what happened, that's your right as well. The ball's in your court*. [Emphasis added.]

Fiacco then slowly admitted to bringing a gun to his meeting with McAfee and shooting him three times. Fiacco alleged that McAfee "attacked" him and "caught" him "off-guard." The two wrestled for the gun and it went off, wounding McAfee in the stomach. Initially, Fiacco asserted that he panicked and left, unsure whether McAfee was alive. Fiacco also described how he and MacDonald returned to the woods to cut up McAfee's body, carry it away and bury it. They then burned the duffel bag. The detectives went through the story multiple times with Fiacco. Only after the detectives questioned whether the medical examiner would find evidence of other bullet wounds did Fiacco admit that after the accidental shot, he "intentional[ly]" fired two more. Fiacco described that McAfee was laying on his stomach and "he sighed almost." Fiacco stood

over McAfee and shot him twice in the back, because he "didn't want him to get back up and try to tackle [him] again."

Fiacco sought suppression of his statement in the district court, arguing that the police did not honor his request for counsel. The district court reviewed the recording and transcript of the interrogation and deemed that Fiacco never made an unequivocal request for counsel. Fiacco renewed his motion in the circuit court and was granted a *Walker*[2] hearing. At the hearing, Detective Morfino agreed that Fiacco was under arrest when he arrived for his custodial interrogation "a little after midnight" on April 27, 2017. In relevant part, Detective Morfino testified that (1) he never inquired whether Fiacco was under the influence of any drugs or medications, but he did not have the impression that Fiacco was intoxicated; (2) he was aware that Fiacco was being represented by attorney Richard Graving in a different criminal matter at that time; and (3) Fiacco never asked to make a telephone call during the disputed interrogation.

The circuit court also denied Fiacco's motion to suppress, concluding without elaboration that Fiacco had not made an unequivocal request for counsel. The court further found that although Fiacco had not explicitly waived his *Miranda* rights and had a limited intellectual capacity, the totality of the circumstances weighed in favor of finding that he had tacitly waived his *Miranda* rights and had done so knowingly, intelligently, and voluntarily.

B

Fiacco contends that the police continued the interrogation after he invoked his right to counsel. Specifically, Fiacco accuses the detectives of "plow[ing] right on, ignoring" his affirmative request for counsel.

We review de novo a trial court's ultimate decision regarding a motion to suppress, but review any factual findings for clear error. *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). A finding is clearly erroneous if the reviewing court "is left with a definite and firm conviction that a mistake has been made." *People v Givans*, 227 Mich App 113, 119; 575 NW2d 84 (1997). Underlying questions of law are reviewed de novo. *People v Daoud*, 462 Mich 621, 629-630; 614 NW2d 152 (2000).

Within this argument, Fiacco also contends that he never actually waived his *Miranda* rights. Fiacco has not properly presented this argument by including it in the statement of questions presented. Nevertheless, we will consider it. The prosecution need not prove that a defendant signed a *Miranda* form; rather a waiver may be "implied from all the circumstances." *Berghuis v Thompkins*, 560 US 370, 384; 130 S Ct 2250; 176 L Ed 2d 1098 (2010). Fiacco admitted that he understood his *Miranda* rights, and his subsequent statement was not coerced. Accordingly, the record substantiates a valid waiver.

We turn to Fiacco's argument that the police disregarded his request for counsel, negating the admissibility of his subsequent statements. A 108-page transcript of the interrogation was

---

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

prepared, and a videotape of the interrogation has also been provided to this Court. Fiacco's first request for counsel appears on page 18 of the transcript.

As the transcript excerpts set forth above chronicle, when Fiacco initially denied involvement in McAfee's death, Detective Morfino urged Fiacco to be more forthcoming. Morfino declared "I've confirmed stuff in the report," insisted "it's gonna come to light eventually," and urged Fiacco to "talk to us right now." Fiacco then stated, "Well then I'd rather speak when my lawyers [sic] present." This statement was an unequivocal and unambiguous request for counsel. Despite that the police should have terminated the conversation immediately, Morfino followed up with: "Okay, is that something you want to do?" The transcript reflects that Fiacco responded: "Ye- -." "Ye- -" is, obviously, either "yes" or "yeah"; under no circumstances can the answer be construed as "no."[3] Fiacco's answer reinforced that he wanted to proceed with counsel present; we discern nothing ambiguous or equivocal about this exchange. And as we discuss in greater detail below, to the extent the trial court relied on later statements in finding equivocation, the court legally erred.

In *Miranda*, the United States Supreme Court announced a rule intended to safeguard the Sixth Amendment right to counsel enjoyed by a suspect in a criminal investigation. The Court explained that when an accused "states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Miranda*, 384 US at 474. Our Supreme Court has made the same point: "Once a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact." *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014) (cleaned up).

Lest there be any doubt about the need for strict adherence to this commandment, in *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the Supreme Court reinforced the requirement that a request for counsel must be honored by an immediate cessation of questioning, and that a suspect's willingness to answer further questions does not counteract an earlier counsel request:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Whether a defendant has actually invoked his right to counsel is an objective question— the defendant must unambiguously invoke the right. *Davis v United States*, 512 US 452, 459; 114

---

[3] Our review of the video confirms that Fiacco said "Yeah." Fiacco accompanied the answer with an obviously affirmative nod of his head. We are not factfinders, however, and these aspects of our review of the video have not entered into our resolution of the issue.

S Ct 2350; 129 L Ed 2d 362 (1994).  If a defendant equivocates or suggests that he or she might want an attorney's presence in the future, questioning may continue.  *People v Granderson*, 212 Mich App 673, 677-678; 538 NW2d 471 (1995).  Stated differently, "[i]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."  *Davis*, 512 US at 459.  If uncertain, the police may ask additional questions to "clarify" the defendant's intention.  *Id*. at 461.

The Michigan Supreme Court has held equivocal a defendant's "statement that he would 'just as soon wait' until he had an attorney before talking to the police, followed immediately by his statement that he was willing to discuss the 'circumstances.' "  *People v McKinney*, 488 Mich 1054; 794 NW2d 614 (2011).  This Court has also found equivocal statements such as "Maybe I should talk to an attorney" and "I might want to talk to an attorney."  *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005).  If a suspect requests a present and certain desire for counsel, however, questioning must end.

In *Smith v Illinois*, 469 US 91, 97; 105 S Ct 490; 83 L Ed 2d 488 (1984) (quotation marks omitted), the police asked the defendant if he would like to have an attorney present during questioning, and he replied, "Uh, yeah, I'd like to do that."  The police continued questioning Smith, who confessed to armed robbery.  The Supreme Court held that Smith's confession was inadmissible because "with the possible exception of the word 'uh' the defendant's statement . . . was neither indecisive nor ambiguous."  *Id*. (quotation marks and citation omitted).  *Smith* guides our analysis in this case.

We find nothing in the slightest equivocal about Fiacco's statement that he would "rather speak when my lawyer[']s present."  This is a statement of *present*, rather than future, intention.  For example, if a waiter at a restaurant inquires, "Would you like a beer?" and the customer answers "I'd rather have a glass of wine," the answer signals that the customer would like her beverage of choice served at that moment in time.  An ordinary and contextual reading of Fiacco's words supports only one reasonable interpretation—he wanted counsel then and there.  And were there any doubt, it was dispelled when Fiacco answered "Ye - -" when asked a question in the present tense, "[I]s that something you want to do."  See also *State v Harris*, 305 SW3d 482, 486, 489-490 (Mo Ct App, 2010) (finding an unequivocal request for counsel where the defendant twice stated that she would "rather appoint a lawyer" and responded "yeah" when asked "are you trying to get [a lawyer] appointed for you?"); *McDaniel v Commonwealth*, 30 Va App 602, 607; 518 SE2d 851 (1999) (holding that the defendant's statement, "I think I would rather have an attorney here to speak for me," was an unambiguous request for counsel); *People v Richards*, 193 Colo 83, 85; 568 P2d 1173 (1977) (holding that defendant's response that he "would rather talk to an attorney first" was an unequivocal request for counsel).

Here, the detective may have interrupted Fiacco's answer to the question, "[I]s that something you want to do?," referring to obtaining counsel.  Any interruption of a completed response did not transform Fiacco's request for counsel to an indirect or ambiguous entreaty.  And although we do not suggest that the detective deliberately interrupted Fiacco to forestall a positive answer, the transcript as it stands is enough to objectively demonstrate that Fiacco desired to have a lawyer present.  Furthermore, anything Fiacco said—or didn't say—after his invocation of his right to counsel is legally irrelevant to our inquiry.  In *Smith*, 469 US at 92, the United States

-11-

Supreme Court made this point abundantly clear: "[A]n accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." See also *Edwards*, 421 US at 484 ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation[.]").

The trial court clearly erred by finding Fiacco's request for counsel equivocal. Because Fiacco unambiguously asked for a lawyer, the balance of his statement should have been suppressed. However, we further conclude that the admission of the statement was harmless beyond a reasonable doubt. Our review focuses on "the probable effect of that testimony on the minds of an average jury." *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020) (citation omitted). We must reverse only "if the average jury 'would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony.' " *Id*.

The evidence of Fiacco's guilt was overwhelming, even absent his confession to the police. MacDonald testified that Fiacco told her that he had shot McAfee, and never mentioned that the shooting had been in self-defense. Her testimony regarding the dismemberment and burial of the body, with which she cooperated at Fiacco's direction, was powerful and persuasive evidence of Fiacco's guilt. Furthermore, much of the improperly admitted statement was exculpatory rather than inculpatory; Fiacco insisted that he had killed McAfee only after McAfee attacked him. In sum, the evidence that Fiacco shot and killed McAfee without justification or excuse was overwhelming and we conclude that it is clear beyond a reasonable doubt that a reasonable jury would have found him guilty of second-degree murder and the other charges even if the statement he made to the police had not been admitted.

### III. ASSISTANCE OF COUNSEL

#### A

Following the close of the parties' proofs, the defense requested a self-defense jury instruction, and the prosecution conceded that such an instruction was "appropriate." Ultimately, on the topics of first-degree murder, second-degree murder, and self-defense, the trial court instructed the jury, in pertinent part, as follows:

> The defendant is charged with first-degree premeditated murder. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. . . .
>
> You may also consider whether the defendant is guilty of the less serious crimes known as second-degree murder and voluntary manslaughter. You may also consider the lesser charge of second-degree murder. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant caused the death of Stephen McAfee; that is, that Stephen McAfee died as a result of gunshot wounds to the head. Second, that the defendant had one of these three states of mind, he intended to kill, or he intended to do great bodily harm to Stephen McAfee, or he knowingly created a very high risk of death

-12-

or great bodily harm, knowing that death or such harm would be the likely result of his actions.

* * *

The defendant claims that he acted in lawful self-defense. A person has the right to use force or even take a life to defend himself under certain circumstances. If a person acts in lawful self-defense, that person's actions are justified *and he is not guilty of first-degree murder*.

You should consider all of the evidence and use the following rules to decide whether the defendant acted in lawful self-defense. Remember to judge the defendant's conduct according to how the circumstances appeared to him at the time he acted. First, at the time he acted, the defendant must have honestly and reasonably believed that he was in danger of being killed or seriously injured. If the defendant's belief was honest and reasonable, he could act immediately to defend himself, even if it turned out later he was wrong about how much danger he was in. In deciding if the defendant's belief was honest and reasonable, you should consider all of the circumstances as they appeared to the defendant at the time.

Second, a person may not kill or seriously injure another person just to protect himself against what seems like a threat of only minor injury. The defendant must have been afraid of death or serious physical injury. When you decide if the defendant was afraid of one or more of these you should consider all of the circumstances; the condition of the people involved, including their relative strength, whether the other person was armed with a dangerous weapon or had some other means of injuring the defendant, the nature of the other person's attack or threat, and whether the defendant knew about any previous violent acts or threats made by the other person.

Third, at the time he acted, the defendant must have honestly and reasonably believed that what he did was immediately necessary.

Under the law, a person may only use as much force as he thinks is necessary at the time to protect himself. When you decide whether the amount of force used seemed to be necessary you may consider whether the defendant knew about any other ways of protecting himself, but you may also consider how the excitement of the moment affected the choice the defendant made.

A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense. However, a person is never required to retreat if attacked in his own home nor if the person reasonably believes that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden, fierce and violent attack. Further, a person is not required to retreat if the person has not or is not engaged in the commission of a crime and, at the time,

-13-

deadly force is used, and has a legal right to be where the person is at that time, and has an honest and reasonable belief that the use of deadly force is necessary to prevent eminent death or great bodily harm of the person or another.

The defendant does not have to prove that he acted in self-defense. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense.

There's been evidence that the decedent may have committed violent acts in the past and that the defendant knew about these acts. You may consider this evidence when you decide whether the defendant honestly and reasonably feared for his safety.

* * *

In this case, there are several different crimes you may consider. When you discuss the case you must first consider the crime of first-degree premeditated murder. If you all agree that the defendant is not guilty of first-degree premeditated murder or if you cannot agree about that crime, you should consider the less serious crimes of second-degree murder and voluntary manslaughter. You decide how long to spend on first-degree premeditated murder before discussing second-degree murder and voluntary manslaughter. You can go back to first-degree premeditated murder after discussing second-degree murder and voluntary manslaughter, if you want to. [Emphasis added.]

B

Fiacco now contends that his attorney should have challenged this instruction or specifically requested an instruction clarifying that self-defense is a valid affirmative defense to second-degree murder and involuntary manslaughter, not just first-degree murder. While we agree that counsel should have requested such an instruction, we conclude that Fiacco is nevertheless not entitled to a new trial.

Fiacco did not file a motion for a new trial and has not sought remand to do so. In any event, we can adequately review Fiacco's challenge on the existing record. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). A claim of ineffective assistance of counsel includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. *Id*. at 663-664.

Counsel clearly should have requested a clarifying instruction here. Self-defense serves to justify the act of "homicide" when "one who is free from fault . . . honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to

-14-

exercise deadly force." *People v Riddle*, 467 Mich 116, 119; 649 NW2d 30 (2002). In other words, the defense is applicable to homicide offenses in general, not just to certain homicide offenses. See M Crim JI 7.15(1) ("If a person acts in lawful self-defense, that person's actions are justified and [he / she] is not guilty of [*state crime*].") (brackets in original). However, the trial court only instructed the jury regarding self-defense in relation to the first-degree murder charge: "If a person acts in lawful self-defense, that person's actions are justified and he is not guilty of first-degree murder." The court did not give a similar instruction regarding the lesser included offenses of second-degree murder and voluntary manslaughter. As given, the instructions suggested to the jury that self-defense was only a valid defense to the first-degree murder offense. Had defense counsel requested a clearer instruction, he would have been entitled to it.

Moreover, as the defense theory was that Fiacco shot McAfee in self-defense, we cannot justify counsel's decision to stand mute. A decision not to request instructions concerning lesser included homicide offenses *at all* might have been a reasonable all-or-nothing strategy, forcing the prosecution to prove premeditation beyond a reasonable doubt or face an acquittal. But knowing that the jury would hear instructions on lesser homicide offenses and not ensuring that the jury understood that self-defense could justify any homicide offense could have no rational justification. Counsel was therefore ineffective in this regard.

But a new trial is only warranted when counsel's ineffective performance created a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. Although self-defense was likely the best available option for Fiacco to pursue in this matter, it was still an extremely weak defense given the record evidence. While a person is permitted to stand his ground and defend against "a sudden, fierce, and violent attack . . . from an attacker who he reasonably believes is about to use a deadly weapon," a person may only use deadly force in response if "he honestly and reasonably believes that it is necessary." *Riddle*, 467 Mich at 119. If the person "uses excessive force," he "does not act in justifiable self-defense." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013).

Based on the evidence, Fiacco may have been justified in firing his first shot at McAfee in self-defense. If believed, McAfee lunged at Fiacco and wrestled with him for the gun, which accidentally fired during the fray. However, there can be no justification for Fiacco firing two more shots at McAfee. Fiacco admitted that McAfee lay face down on the ground, emitting a sigh or groan. Fiacco was in no immediate danger and could have fled his potential attacker. Instead, Fiacco stood over McAfee and fired two shots at the injured man's back. The evidence establishes that Fiacco could not reasonably believe that McAfee was about to use deadly force against him, and self-defense could not excuse these two intentional shots. Given this evidence, along with evidence of Fiacco's gruesome method of hiding his crime, there is no reasonable probability that the jury would have acquitted Fiacco of any homicide offense, or even convicted him of the lesser manslaughter offense. Accordingly, although counsel should have ensured a properly instructed jury, Fiacco cannot establish that he is entitled to a new trial.

## IV. UPWARD-DEPARTURE SENTENCE

Finally, Fiacco contends that the trial court improperly imposed an upwardly departing sentence for his second-degree murder conviction. The advisory minimum sentencing guidelines range for Fiacco's second-degree murder conviction was 270 to 450 months (at most 37½ years)

or life. The court did not choose a life sentence and sentenced Fiacco to a term of 50 to 70 years. The 50-year minimum sentence exceeded the top end of the guidelines range by 150 months, or 12½ years.

We review for reasonableness an upwardly departing sentence. *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). In doing so, we consider "whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). After all, "the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing." *People v Dixon-Bey*, 321 Mich App 490, 524-525; 909 NW2d 458, 477 (2017). In considering proportionality of a departure sentence under the *Milbourn* standard, "[f]actors that may be considered . . . include, but are not limited to":

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (quotation marks and citation omitted).]

To facilitate appellate review, the trial court must explicitly state the reasoning underlying the upward departure, "includ[ing] an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been[.]" *Dixon-Bey*, 321 Mich App at 524, quoting *People v Smith*, 482 Mich 292, 311; 754 NW2d 284 (2008).

The trial court explained its decision to impose an upward-departure sentence as follows:

[J]ust so we're clear, I'm not sentencing [Fiacco's] family. I'm not sentencing the [McAfee's] family. I think [Fiacco] has sentenced all of those people himself.

> You destroyed not only [McAfee's] life, but his family and friends. You've destroyed your family's life as well as your own. And, then, for 13 months, let everyone wallow in fear and distress, and hope was in there, as well, which I think is almost the worst part.

> Despite them reaching out to you, you continued to lie. You gave nothing away. You even told [McAfee's mother] you were a better person now. The only reason you did tell someone is because you needed assistance to continue the crime, to continue to hide, to continue to leave everyone distraught, and you brought [MacDonald] into it and destroyed, yet, another family.

> Your comment . . . even after this all came out, was no comment. Even after they found [McAfee], there was no remorse shown then. You shot him two more times after he was down the first shot.

I do understand there are some certain disabilities or mental illnesses or considerations such as that but, quite frankly, it cuts both ways, and makes me concerned about your ability to ever be rehabilitated.

I've considered the sentencing guidelines. I do know they're now advisory, not mandatory. Taking into consideration discipline, protection of society, potential for reform, deterence [sic], although I don't know that deterence [sic] plays a big role in these, in these types of scenarios, I find a reasonable sentence does, fact, exceed the guidelines, and I'm going to sentence you to 600 to 840 months in the Michigan Department of Corrections.

The court properly relied on several factors in determining that an upwardly departing sentence was appropriate in this case. The court noted a factor that was not considered by the guidelines: Fiacco's reprehensible conduct in coercing his then 17-year-old live-in girlfriend into assisting him in dismembering and disposing of McAfee's body and his repeated threats against her life and the lives of her family. The court also properly considered Fiacco's apparent lack of remorse, despite his protestations of remorse at sentencing, as betrayed by his repeated deception and his longstanding, gruesome attempts to avoid prosecution. It was also appropriate for the trial court to consider Fiacco's potential for rehabilitation. The combination of Fiacco's limited intellectual capacity and the stark brutality of his actions do seemingly provide little hope of rehabilitation in a correctional setting, especially given that Fiacco had received continual therapy and mental health treatment throughout his life. It is doubtful that any such services he may receive while incarcerated will be superior to those he was already receiving when he committed the subject gruesome offenses. Moreover, although the trial court did not expressly consider the longstanding friendship between Fiacco and his victim, that relationship is another factor that supported an upward-departure sentence, as did the overall seriousness of the offense at issue. Given this record, we cannot find error in the court's sentencing decision.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Douglas B. Shapiro